## APPEAL OF JAMES E. DOUGLASS ET AL.

FROM THE DECREE OF THE COURT OF COMMON PLEAS OF
WESTMORELAND COUNTY.

Argued October 7, 1887—Decided January 3, 1888.

1. The act of March 14, 1850, P. L. 202, granting an exclusive privilege of maintaining a ferry and authorizing the grantee to make good and convenient landings, does not impose the duty to acquire the landings in fee.

2. Defendants in a bill filed to restrain interference with ferry rights granted under said act have no standing to allege that the grantee has not complied with the terms of his grant.

3. Where, under the grant in said act it is found as a fact that the grantee of the franchise for many years maintained only a skiff-crossing, but there was no public demand for other transportation, and no evidence of bad faith to the state or to the public, the grant is not affected by the provisions of § 1, article XVI., of the constitution.

Before GORDON, C. J., PAXSON, STERRETT, GREEN and WILLIAMS, JJ.; TRUNKEY and CLARK, JJ., absent.

No. 131 October Term 1887, Sup. Ct.; court below; No. 135 in equity.

On April 10, 1885, Eli Suter filed a bill in equity against James E Douglass, George McCowan and Robert Abercrombie, averring that under the authority of an act of the legislature the plaintiff for thirty-five years and upwards had kept and maintained a ferry across the Youghiogheny river at Suter's saw-mill in Sewickley township, and that the defendants within three months past had unlawfully and injuriously

kept and maintained boats and other crafts for the purpose of transporting travelers and others for hire, across said river at the plaintiff's ferry, and still continued, etc.; praying for an injunction and an account. After issue joined by answer and replication, the cause was referred to *Mr. A. M. Sloan*, as examiner and master, who found the facts following:

By the act of March 14, 1850, P. L. 202, which is as follows:

§ 1. That Eli Suter, his heirs and assigns, shall have the right and privilege, at their expense, to make good and convenient landings on the east and west sides of the Youghiogheny river, at Suter's saw-mill, in Sewickley township, Westmoreland county.

§ 2. The said Eli Suter, his heirs and assigns, shall keep the said landings and ferry in good condition and repair, fit for the transportation and passage of men and horses, and other animals and carriages of all descriptions; and shall keep good and substantial boats and other necessary crafts, and competent and careful ferrymen, who shall constantly, as occasion may require, attend for the purpose of transporting travelers and others, cattle and carriages over the said river, with all reasonable diligence and attention.

§ 3. That the said Eli Suter, his heirs and assigns, for keeping up and maintaining the said landings and ferry, as aforesaid, shall receive from persons passing over said river at said ferry, such prices and charges as are customarily paid at other ferries on said river, subject to such rules and regulations as the Court of Quarter Sessions of the county of Westmoreland may direct: Provided, That nothing in this act contained shall be so construed as to invest in said Eli Suter, and his heirs and assigns, the right to receive or charge any travelers, cattle, or carriages, as aforesaid, on land belonging to any other person or persons, without the consent of the owner or owners of said land, or to prevent any future legislature from resuming the privileges hereby granted.

The plaintiff was duly authorized to establish a ferry in Westmoreland county, at Suter's saw-mill, and to make good and convenient landings on the east and west sides of the Youghiogheny river. After the passage of this act the plaintiff established a skiff ferry for passengers, and a flat for teams,

etc., from a point at the terminus of the township road on the east side, to the terminus of the Elizabeth road on the west side. The point on the east side, viz.: the township road, was used for a landing until 1855, when the road was abandoned and a new one made about forty feet above; the new road running under the trestle work used in connection with the plaintiff's saw-mill. In 1860 the public road was again changed to its present location, the terminus of the road being used as a landing. The plaintiff owns the land along the shore of the east side of the river for about four hundred yards, both above and below the public road on the east side. On the west side of the river the landings used by the plaintiff, or those under him, depended somewhat on the stage of the water. The two most used, however, were at the Elizabeth road, and at a flat rock about four hundred feet above, known as the upper landing. The upper landing was used only for skiff purposes until some time in 1881 or 1882, at which time a road was made by the plaintiff down to this landing, after which teams could be landed at this point. Prior to this the flat landing was at the Elizabeth road. The plaintiff never acquired any land, for landing purposes, on the west side, by lease or otherwise, the land belonging to John J. Douglass and his brother William as tenants in common, from some time prior to 1850 up to 1866, when partition thereof was made; William Douglass taking the land upon which plaintiff's boats landed. He held it for some time thereafter when it was sold at sheriff's sale to A. M. McClure, the present owner. The plaintiff kept the landings at the township road, on each side, in reasonable condition and repair. He did not at all times have boats for the transportation of "men and horses and other animals, and carriages of all description." From 1873 to 1880 there seems to have been no boats for the transportation of wagons. The travel across the river at that point was very light, prior to the construction of the railroad on the west side; not sufficient to justify the keeping of a regular ferryman.

James E. Douglass, the respondent, on or about the 23d January, 1885, established, for public use, a skiff and flat ferry, extending from a point at the terminus of the Elizabeth road on the west side, to a point at the public road on the east side, the terminal points of the rival ferries being the same, and the

course of each substantially the same. The defendant has operated, and still continues to operate, his ferry so established as aforesaid. This ferry has no charter, nor has the respondent acquired, by lease, or otherwise, any ground for the landings used by him on either side of the river, the land on the east side belonging to plaintiff, on the west side to McClure.

Upon the foregoing facts the master made the following report:

The prayer of the bill is for an injunction to restrain and enjoin the defendants, their servants, agents or employes, from maintaining a ferry between the east and west sides of the Youghiogheny river, at Suterville, and from carrying passengers and freight for hire as a ferry. It is asserted by the plaintiff that the ferry, as established and maintained by the defendants, is without authority of law, and in violation and destructive of the rights, privileges, and franchises of the plaintiff, as conferred by charter; to which, in substance, the defendants respond, denying the material facts asserted, and that the grant made by the legislature to complainant is invalid and void, and the remedy adopted by complainant is not the proper one, and that he has a complete and adequate remedy at law. These propositions as advanced by the parties to this bill, necessarily involve an examination into the nature and character of public ferry rights.

The right to establish and keep a public ferry is a franchise which in England, is a royal privilege in the hands of a subject: 2 Bl. Com., 37; 3 Kent Com., 458.

If it be true, then, as stated, that a public ferry at common law was a franchise, it logically follows that, at common law, no person could lawfully establish a public ferry without the grant of the franchise from the sovereign power. The franchise in England is in the crown. The doctrine that a public ferry cannot be set up or exercised by any of the king's subjects without prescription or a charter or grant from the king, is fundamental and undisputed. "A ferry is publici juris. It is a franchise which no one can erect without a license from the crown:" Blisset v. Hart, Willes, Rep. 508; Milton v. Huden, 32 Ala. 30; Harrison v. Young, 9 Ga. 359.

Is the common law in force in Pennsylvania? The American colonists brought with them, and introduced by common

consent, such parts of the then existing common and statute laws of the mother country as were applicable to the new situation, and these became by adoption, and still remain, so far as they are not inconsistent with our institutions and government, or repealed by statute, the law of this country: Patterson v. Winn, 5 Pet. 241; Commonwealth v. Leach, 1 Mass. 61; State v. Cummings, 33 Conn. 260.

It must be conceded, therefore, that the common law of England is the law of Pennsylvania, except in so far as it was unsuited to our condition at the time of the Revolution, or has been changed by statute. Excluding the act of 1874, and its supplements, no statute of this state can be shown which has altered or changed the common law with regard to ferries. If it was unsuited to our condition, at the time of the Revolution, then Pennsylvania is an exception to every sister state in which the common law forms the substratum of jurisprudence. " In this country ferries are established by legislative authority, which is exercised either directly, or by a delegation of powers to courts, commissioners, or municipalities:" Mills v. St. Clair Co., 8 How. 581; McRoberts v. Washburne, 10 Minn. 23; Stark v. Miller, 3 Mo. 470.

To show what the legislative view in Pennsylvania has always been, it is only necessary to refer to the many private acts of assembly establishing ferries, found in our pamphlet laws from 1782, up to 1874. It will be found that they comprise two classes: (1) Those not exclusive in terms; (2) Exclusive within stated distances.

In almost every case where the right is granted to an individual, it is granted to him, his heirs and assigns, as in the case under consideration; thus indicating that the right was a species of property, an hereditament, or, in other words, a franchise. The character of these acts of assembly shows that it is one of the usual and ordinary functions of the state to provide the public a regular, convenient, and safe means of transportation across our rivers, and to secure the requisite attention to the wants of the public; and to compensate the ferry owner, he is authorized to levy ferriage and has rights more or less exclusive conferred upon him. It is necessary that the rates of ferriage be fixed by law. No greater evil could well be imagined than the unrestrained power on the

part of individuals to exact from the traveler, who cannot brook delay, or stipulate for terms whatever cupidity might dictate : Nashville Bridge Co. v. Shelby, 10 Yerg. 280.

For these reasons the franchise in England is in the crown, and in this country in the state ; and these acts of assembly above referred to, show conclusively that in the opinion of our legislature a right to maintain a public ferry was not a right common to all, but vested in the state, and the right so to be exercised need not be in terms exclusive to constitute a franchise : 2 Washb. Real Prop., 292 ; Broom's Leg. Max., 712 ; 3 Kent Com., 458.

If, therefore, at common law, the right to maintain a public ferry was a franchise and required a sovereign grant for its lawful exercise, and the common law as to ferries is the law of Pennsylvania, we proceed to inquire whether the defendant has any public ferry rights under or by virtue of any statute in Pennsylvania. There is no private act of assembly authorizing defendant to maintain a public ferry. Under the act of 1874, and its supplements, a charter must be procured, thereby giving an express grant from the state to establish a public ferry. No such grant has been shown. But the learned counsel for defendant say, " That the right to keep and maintain a public ferry belongs to every riparian owner, so long as it does not conflict with any exclusive grant." To which we answer, that the defendant is not a riparian owner, but even if he were, we do not think " that a party, even though he be a riparian proprietor, and own the lands on both sides of the stream, can set up and operate a public ferry, and levy ferriage or tolls, without the consent of the state : " Young v. Harrison, 6 Ga. 131 ; Nashville v. Shelby, 10 Yerg. 280 ; Cooper v. Smith, 9 S. & R. 26, 33 ; Stark v. McGowen, 1 Mott & McC. 387 ; Gates v. Anderson, 13 Ill. 413 ; Bush v. Bridge Co., 3 Post (Ind.) 21 ; Johnson v. Erskine, 9 Tex. 1.

These authorities abundantly establish that a ferry franchise must be conferred by the government ; that ownership of the soil will not give the right to set up or operate a public ferry for toll. Therefore, having found that the defendant has no public ferry rights under any private act of assembly, nor under a charter, and that he has no right to maintain a public ferry as a riparian owner, we will proceed to inquire if the plaintiff has such a franchise as entitles him to enjoin the defendants from operating the ferry complained of.

Master's Report.

The complainant, it is admitted, has a charter under an act of assembly approved March 14, 1850, P. L. 202, authorizing him, his heirs and assigns, to maintain a public ferry between the east and west sides of the Youghiogheny river at Suter's saw-mill, and to collect tolls; and there is imposed the corresponding duty of maintaining the ferry in good order, for the accommodation of the public, and subject to such rules and regulations as the Court of Quarter Sessions may direct. Referring to this grant, we find it belongs to the class referred to elsewhere, as not exclusive in terms. The defendant contends that plaintiff has no exclusive right conferred upon him within certain or any limits of territory, as against any other person who is otherwise qualified to land on the shores of the Youghiogheny river. This proposition is, we believe, correct. A second, or other ferry company, may be granted a franchise to establish a ferry within a reasonable distance of the location of the plaintiff's ferry, possibly between substantially the same points; but we have not that question before us. This contest is not between two grantees of the state, but against one having no grant from the state and no right to operate a public ferry, and who is operating such a ferry to the injury of the franchise duly granted by the state. That the grant of the ferry franchises, without it being exclusive in terms, is the grant of the exclusive privilege as against one having no such grant, is, we think, a proposition abundantly established by the authorities heretofore cited.

It is also clear in respect of franchises granted by the legislature, that the state may waive all questions of non-performance of certain conditions, and accept of any performance. It is, therefore, a wise principle of law, that no individual can be permitted in a collateral proceeding to claim or to establish a forfeiture in any such case. This right belongs to the king, alone in England, and here to the state alone, and this is to be accomplished only by a direct proceeding for the direct purpose, as by scire facias, or quo warranto. In Angell & Ames on Corporations, 507, it is said: "It cannot be shown in defence to a suit of a corporation . . . . . that the plaintiffs have forfeited their corporate rights by misuser or nonuser." See also 2 Kent Com., 313.

An injunction is the appropriate remedy to protect a party

in the enjoyment of a ferry franchise against continuous encroachments. Such continuous encroachments constitute a private nuisance, which courts of equity will abate by injunction. The jurisdiction rests in the firm and satisfactory ground of its necessity to avoid a ruinous multiplicity of suits, and to give adequate protection to plaintiff's property in his franchise.

The Courts of Common Pleas have jurisdiction in equity to restrain by injunction repeated acts of trespass upon the legal rights of complainant: Scheetz's App., 35 Pa. 88. A single trespass or several, not coupled with circumstances indicating that they were repeated continuously, are generally redressed by common law action of damages; but when they are constantly recurring and threaten to continue, it is well settled that they may be redressed in equity by injunction: Stewart's App., 56 Pa. 422; Story's Eq., 925, and Com. v. Railroad Co., 24 Pa. 159. But the plaintiff never owned or in any way acquired the lawful use of a landing on the west bank of the river, the land belonging to A. M. McClure, from whom the plaintiff never acquired the right of landing; and it is clear that a ferry license to one, other than the riparian owner, will not authorize him, against the consent of the owner, to land or receive freights on another's freehold; and, as one of the landings on the west side is a public road, constructed and laid out over McClure's land, it is equally clear that the plaintiff could not use the public road for ferry landings against the consent of the owner. In Chambers v. Furry, 1 Y. 167, it was decided that the dedication or laying out of grounds as a public road gave no right to the defendants to land upon or receive freights from the plaintiff's freehold on the banks of a navigable river without his consent. See also Cooper v. Smith, 9 S. & R. 31; not even, it was held in Chess v. Manown, 3 W. 219, at the terminus of a highway, between high and low water mark. But the owner of the soil does not complain, and the defendant is not in a position to do so. But on the east side, the defendant uses the highway for a landing, the road being constructed and laid out on land belonging to plaintiff. Casting aside plaintiff's charter, can defendant do this against plaintiff's protest? Assuredly not. He might transport himself and property, and use the highway as a landing without Suter's consent, but it does not follow that he can convert the

personal right into a source of emolument, and, at his own pleasure, use the road as a ferry landing. Therefore, from the evidence submitted, and under the law as we understand it, we have determined, that the plaintiff has a right to maintain and operate a ferry at "Suter's saw-mill," and that the defendant is a trespasser without authority, and without charter privileges, and the acts of trespass being frequent and continuous, we are of the opinion that a perpetual injunction should issue as prayed for in the bill.

Exceptions to this report were filed by the defendants and overruled by the master. On argument, the court, JAMES A. HUNTER, P. J., confirmed the report filing the following decree :

And now, May 7, 1887, the matter having heretofore come on to be heard at chambers, on bill, answer and report of the examiner and master, the plaintiff and one of the defendants appearing in propria persona, and all of the parties by counsel as well; and, after full hearing and argument, and upon due consideration, the opinion and finding of the master is approved, and a perpetual injunction is now granted, ordering and decreeing that the said respondents, their servants, agents, and employees, be enjoined and restrained from keeping and maintaining boats and other necessary crafts for the purpose of transporting travelers and others, cattle and carriages over said river and ferry aforesaid; from using the landings on said river for the purpose aforesaid, and from charging, receiving, and collecting prices, charges or tolls for transporting travelers, and others passing over said river at said ferry, as craved in the first paragraph of plaintiff's prayer, and that the defendants pay the costs.

Thereupon the defendants took this appeal assigning the said opinion and decree as error :

*Mr. Jas. S. Moorhead* and *Mr. John B. Head*, for the appellants :

1. Conceding, that upon compliance by the plaintiff with the provisions of the act, the grant to him was an exclusive one between the termini named on the waters of the Youghiogheny, yet, on the authority of many cases, we say that by

the grant itself the plaintiff acquired no rights on the shores: Chambers v. Furry, 1 Y. 167; Cooper v. Smith, 9 S. & R. 26; Chess v. Manown, 3 W. 219; Root v. Commonwealth, 98 Pa. 170.

2. The injunction restrains the defendants from landing on the west side of the river, where the plaintiff has acquired no right whatever. The land is owned by one McClure. So the master finds, but holds that as McClure does not complain, the defendants cannot. In ejectment the plaintiff recovers on the strength of his own title. Can the plaintiff recover alleging in his bill a trespass on land not owned by him?

3. A perusal of the testimony will convince this court that there was a continuous disregard for many years by the plaintiff of the requirements of the grant that he should keep good and substantial boats, and competent and careful ferrymen who should constantly as occasion might require attend for the transporting travelers with all reasonable diligence and attention. The plaintiff failed in essential particulars to "commence business in good faith," and therefore he is under the ban of § 1, article XVI. of the constitution. The complainant having failed to commence business—to perform his part of the contract, we urge that the constitutional provision referred to is equivalent to, and greater than, "any future legislation," in resuming the grant contained in the act: Penn. R. Co. v. Duncan, 111 Pa. 352; Chincleclamouche L. & B. Co. v. Commonwealth, 100 Pa. 438.

*Mr. Vin. E. Williams* (with him *Mr. Wm. A. Griffith, Mr. C. C. Montooth, Mr. E. A. Montooth* and *Mr. E. E. Robbins*), for the appellee:

1. The defendants have shown neither nonuser nor misuser, and it is submitted that the maintaining of a skiff ferry for thirty-seven years, from the date of the grant to the present time, as found by the master, and keeping the landings in "reasonable condition and repair," together with a flat boat and competent ferryman when occasion required, is a full compliance with the terms of the grant and the constitutional provision. Chincleclamouche L. & B. Co. v. Commonwealth, 100 Pa. 438, differs widely and is decisive of nothing here.

2. The master finding that the defendants have no grant

and have acquired no landing on either side, what right have they to maintain a ferry, or by competition to destroy the plaintiff's franchise? Cooper v. Smith, 9 S. & R. 32; Chess v. Manown, 3 W. 219; P. & L. E. R. Co. v. Jones, 111 Pa. 212; Bird v. Smith, 8 W. 434; Johnson's App. 95 Pa. 78.

3. The legality of an existing corporation cannot be inquired into collaterally; the inquiry when directly made can be instituted only by the attorney general or some other prosecutor who represents the public. Therefore the defendants cannot ask the court to say that the plaintiff's grant has been defeated by nonuser: Irvine v. Lumbermen's Bank, 2 W. & S. 204; McCully v. Railroad Co., 32 Pa. 25; Turnpike Co. v. McConaby, 16 S. & R, 144; Commonwealth v. Insurance Co., 5 Mass. 230; Attorney General v. Insurance Co., 2 Johns. Ch. 380; Dyer v. Walker, 40 Pa. 160; Hanover J. etc. R. Co. v. Haldeman, 82 Pa. 36; Becket v. B. & L. Ass'n, 88 Pa. 213; Spahr v. Farmers' Bank, 94 Pa. 434; Freeland v. Insurance Co., 94 Pa. 505; P. W. & B. R. Co. v. Conway, 112 Pa. 517.

OPINION, MR. JUSTICE PAXSON:

This case has been so fully discussed by the learned master and the court below that but little needs to be added.

We start out with the admission by the appellants that the grant to appellee of ferry privileges by the act of March 14, 1850, is an exclusive one between the termini named on the waters of the Youghiogheny river. We have the further fact, found by the master, and not denied, that the appellants have no grant of ferry rights from the legislature, there or elsewhere. We have the additional fact that the appellee has for about thirty-five years maintained and operated a ferry at the place designated. For the earlier portion of the time he kept a skiff for conveying passengers merely. The master finds: "From 1873 to 1880 there seems to have been no boats for the transportation of wagons. The travel across the river at this point was very light prior to the construction of the railroad on the west side; not sufficient to justify the keeping of a regular ferryman." In the early part of the year 1885, when from various causes the business of the ferry had increased to an extent that promised some return to the appellee for his outlay, James E. Douglass, one of the appel-

lants, established a ferry between the same termini, and practically over the same route. He has no license from the state, nor does he show any authority whatever for establishing a public ferry. He justifies dividing the scanty toll with the appellee by alleging that the latter has not acquired a landing-place on the west side of the river, from which we are asked to decree that the appellee has not complied with the act of 1850, and is not entitled to be protected in the use of his ferry as against the appellant.

We do not take this view of the matter. The act of 1850 does not in terms impose upon the appellee the duty of acquiring landings in fee. It authorizes him " to make good and convenient landings on the east and west side of the Youghiogheny river," and " for keeping up and maintaining the said landings and ferry," he is " authorized to charge customary tolls," etc. On the east side of the river the appellee lands upon his own ground ; on the west side he has been landing all these years without complaint of any one, property owner or passenger, and the master finds that he has kept the landings " in reasonable condition and repair."

We are of opinion that the appellants, who show no right to set up a ferry, have not any standing to allege that the appellee has not complied with the act of assembly. The commonwealth may, if she thinks appellee has not complied with the law, and is maintaining an illegal ferry, call him to an account, and forfeit his rights under the act. So far as developed by this case, however, we think he has substantially complied with the act of 1850.

The appellants contend further that the grant is a dead letter for the further reason that there never having been a reasonable compliance therewith, it fell with the adoption of the present constitution, article XVI., section 1, of which provides: " All existing charters, or grants of special or exclusive privileges, under which a bona fide organization shall not have taken place and business been commenced in good faith, at the time of the adoption of this constitution, shall thereafter have no validity," and Chincleclamouche Lumber and Boom Company v. Commonwealth, 100 Pa. 438, and some other cases were cited in support of this view. No fault is found with these cases ; they are good law, but they have no application to the

facts of the case in hand. Here business was commenced in good faith and has been continued to the present time. The fact that until a few years ago a skiff only was used for passengers, and that there was no flat-boat for wagons and other vehicles, is not, under the circumstances, evidence of bad faith to the state or the public, and no complaint has ever been made by either. It is very evident that until recently there was no demand for a flat; at least not enough to justify placing one on the ferry. There is nothing in this point, and we would not have noticed it but for the fact that it might otherwise have given the impression that it had been overlooked.

The decree is affirmed, and the appeal dismissed at the costs of appellants.