## CHARLES A. PATTERSON vs. JACOB WOLLMANN.

Opinion filed June 10th, 1896.

### Ferry Law—Constitutionality.

The statute authorizing boards of county commissioners of the several counties of the state to grant exclusive ferry franchises for a period of years to the highest bidder therefor is not repugnant to section 20 of the constitution, which declares that no privileges or immunities shall be granted to any citizen or class of citizens which shall not be granted to all citizens on the same terms.

### Exclusive Franchise.

No one has a right to operate a public ferry for toll without authority from the state. The franchise granted by it to a person or corporation to run a ferry may be, and usually is, an exclusive franchise.

### Legislative Control Absolute.

Whether the state will itself operate the public ferries within its borders, or whether it will confer this right on others, and the terms on which it will give others this special privilege, and whether an exclusive franchise shall be granted,—these and all other questions connected with the subject are absolutely within the control of the legislature.

### Remedy by Injunction.

Injunction is the proper remedy to employ when one without authority of law is operating a ferry to the injury of another, who is the owner of a ferry franchise.

### Legality of Grant.

Certain questions relating to the legality of the plaintiff's franchise examined, and the franchise *held* to have been legally granted to plaintiff by the board of county commissioners of the proper county.

### Powers of Commissioners.

The board of county commissioners to which an unorganized county is attached for judicial purposes has no power to grant a ferry franchise between points one of which is within the unorganized, but neither of which is within the organized county, whose board granted the franchise.

Appeal from District Court, Emmons County; *Winchester*, J.

Action by Charles A. Patterson against Jacob Wollmann for injunction. From an order denying a temporary injunction, plaintiff appeals.

Reversed.

*Boucher & Philbrick*, for appellant.

*F. H. Register*, for respondent.

CORLISS, J. The plaintiff is seeking to restrain the defendant from operating a ferry between Winona, in Emmons County, and Ft. Yates, in Boreman County, in this state. The appeal is from an order denying a motion for a temporary injunction. The application for such injunction was made upon the pleadings. We must therefore assume that all the facts set forth in the answer are true, and also those which appear upon the face of the complaint, and are not denied. The merits of the whole case are really before us. If the plaintiff is not, upon the pleadings as they stand, entitled to the temporary injunction prayed for, it is conceded that he must ultimately fail in his action. He claims an exclusive right as against the defendant to operate a ferry between the points named, under a ferry franchise granted to him for a period of years by the board of county commissioners of Emmons County, within whose territorial limits one of the landing places is located. It is settled law that the right to operate a ferry is not common to all citizens. It is a franchise emanating from the sovereign power. In the absence of a title based on prescription, no one can lawfully maintain a ferry without authority from the state. *Appeal of Douglass*, (Pa. Sup.) 12 Atl. 834; *Mills* v. *St. Clair Co.*, 8 How. 581; *McRoberts* v. *Washburne*, 10 Minn. 23 (Gil. 8;) *Stark* v. *Miller*, 3 Mo. 470; *Power* v. *Village of Athens*, 99 N. Y. 592, 2 N. E. 609; *Bridge Co.* v. *Paige*, 83 N. Y. 178; *Conway* v. *Taylor's Ex'r*, 1 Black, 603. It is upon this principle that the territorial legislature enacted sections 1361-1369, Comp. Laws, which were in force at the time the plaintiff received his grant of the ferry franchise on which he bases this action for an injunction. Under these sections power is vested in boards of county commissioners to grant to the highest bidder for a ferry privilege at a particular place a ferry lease for a term of years not exceeding 15, to be fixed by the board. They further declare that it shall be unlawful for any person to establish, maintain, or run upon any waters within the territory (now state) any ferry upon which to convey, carry, or transport any person or

property for hire or reward without first having obtained a license as therein provided for.  The ferry lease under which defendant attempts to justify his running of a ferry between the same points between which plaintiff is operating his ferry was granted by the board of county commissioners of Morton County.  Neither landing place is within that county.  Nor can it be claimed that the board of county commissioners of that county have any power to grant a license to run a ferry between points one of which is within Boreman County merely because the latter county is attached to Morton County for judicial purposes.  Boreman County being an unorganized county, the license to be valid, must be issued by the secretary of state.  Comp. Laws, § 1364. We are therefore not called upon in this case to settle the question whether, when the board of county commissioners of an organized county has granted a ferry franchise to a citizen between two points one of which is within that county and the other within another county, the board of county commissioners of the latter county can subsequently, and during the life of such franchise, grant another ferry franchise between the same places.  There is much force in the position that when the grant is once made it is no longer within the power of the same or any other board of county commissioners to grant another ferry franchise within two miles of the one previously granted.  Section 1361, Comp. Laws, in terms declares that, when any ferry lease has been granted, no other lease shall be granted within a distance of two miles thereof across the same stream.  But it is barely possible that the legislature merely intended to give each board of county commissioners control of the ferry privileges within its county, so that such board could grant the franchise to operate a ferry from any portion of the bank of a stream within such county to the opposite bank, but not from the opposite bank to the place within such county from which he was authorized to receive passengers.  See *Powers* v. *Village of Athens*, 99 N. Y. 592, 2 N. E. 609, where the court say:  "We think, from all this legislation, without referring to it more minutely, it is quite clear that the

legislature intended to place the ferries on the one side of the river under the exclusive control of the city, and on the other side under the exclusive control of the village." See, also, *Giles v. Groves,* 12 Adol. and E. (N. S.) 721; *Pim* v. *Curell,* 6 Mees. and W. 234; *Conway* v. *Taylor's Ex'r,* 1 Black, 603-630.

The plaintiff in this case stands, and must stand, upon the validity of his alleged franchise. If the privilege of operating a ferry between these points has been granted to him by the sovereign power, he may enjoin all persons from operating a ferry between such points to his injury, provided they are acting without authority of law. That an injunction will be awarded in such cases is recognized by all the adjudications. *Appeal of Douglass,* (Pa. Sup.) 12 Atl. 834; *Tugwell* v. *Ferry Co.,* (Tex. Sup.) 13 S. W. 654; *Carroll* v. *Campbell* (Mo.) 17 S. W. 884; *Capital City Ferry Co.* v. *Cole & Callaway Transp. Co.,* 51 Mo. App. 228; *Chard* v. *Stone,* 7 Cal. 117; *Walker* v. *Armstrong,* 2 Kan. 198; *Ferry Co.* v. *Wilson,* 28 N. J. Eq. 537; 2 High, Inj. § 927; *Conway* v. *Taylor's Ex'r,* 1 Black. 603. Nor is it necessary, to entile the owner to relief in equity, that the franchise should be an exclusive franchise in the sense that the grant of another similar franchise to be exercised and enjoyed at the same place would be void. The theory on which the low proceeds is that the defendant, who has no franchise, is acting in violation of law in operating a ferry without authority from the sovereign power, and that the owner of the franchise may complain of and restrain such illegal acts when they result in injury to his franchise, which in the eye of the law, is property. As to the one who is invading his rights without legal sanction, the franchise is an exclusive franchise, although the owner of it might not be entitled to any protection as against the granting of a similar franchise to another. There appears to be no controversy on this point. *Appeal of Douglass* (Pa. Sup.) 12 Atl. 834; *Tugwell* v. *Ferry Co.,* (Tex. Sup.) 13 S. W. 654; *Carroll* v. *Campbell,* (Mo.) 17 S. W. 884, 19 S. W. 809; *Tugwell* v. *Ferry Co.,* (Tex. Sup.) 9 S. W. 120-124. The franchise granted to the plaintiff was in terms exclusive,

and the statute provides that no other franchise shall be granted within a distance of two miles. Comp. Laws, § 1361. It is this provision of the statute which allows, and indeed compels, the board of county commissioners to grant an exclusive franchise within the specified limits to the highest bidder, that is here challenged as obnoxious to section 20 of the constitution. That section declares that "no special privileges or immunities shall ever be granted which may not be altered, revoked or repealed by the legislative assembly, nor shall any citizen, or class of citizens, be granted privileges or immunities which upon the same terms shall not be granted to all citizens." We are clear that this section has no relation to ferry franchises. The construction we are asked by counsel for defendant to place upon this section would result in abridging the power of the state over a subject which has for more than two centuries been regarded as exclusively within the control of sovereign power. A ferry is a moving public highway upon water. The highway upon land meets at either shore with a physical obstruction in the shape of a stream of water. How shall this highway be carried over this stream? The solution of this problem is exclusively within the province of the sovereign power. In this country such power is exercised by the state legislatures. It rests with such bodies, subject to such constitutional restrictions as relate to the matter, to determine whether there shall be a bridge or an embankment of earth constructed or a ferry maintained to carry a highway over a stream. The ferry may be directly under public control or the sovereign power may authorize a person or corporation to maintain this portable highway. When the power is delegated, the grantee of the franchise discharges a public duty in operating the ferry; and in the discharge of that duty he exercises a privilege which the state may grant or withhold at pleasure. The franchise does not consist of the right to sail his boat upon the stream, or to moor it by the shore. It is the privilege of operating a floating highway, of establishing and maintaining a public thoroughfare over water, and of charging tolls for the

facilities for passage so afforded. Whatever right is enjoyed by the citizen in this regard is derived exclusively from the sovereign power, which has full control over the whole subject. The state may exclude all persons from the business. It may run all ferries itself. The same exclusive right which it has over the subject of maintaining a highway over a stream by means of a ferry at any particular point it may vest in its grantee. That it would possess this power but for section 20 of the constitution does not admit a doubt. It has been for centuries recognized as a proper mode of exercising the power to grant ferry franchises to make such grants exclusive. The chief element in the value of a ferry franchise is its monopoly feature. Of course, such a franchise would possess some value, although there were other lawful ferries at same place. But it would be a misnomer to call the right to operate a ferry at a given point a franchise if the enjoyment of such right was open to every one on the same terms. If no exclusive right can be granted, all the sovereign power can do, if it does not itself operate all the ferries in the state, is to pass a general law prescribing the terms on which all citizens shall be allowed to maintain ferries, leaving the business open to all who see fit to engage in it. The construction of section 20 contended for by counsel for defendant imputes to the people a purpose to take from the legislature the power to vest in another the exclusive right to maintain a ferry which it is clear it could exercise itself. Such an interpretation of the organic law can be sustained only on the theory that the people, for reasons, which are not discoverable, intended to curtail the police power of the state with respect to public ferries in a very important, if not vital, particular. For centuries such police power has embraced this element of the right to grant an exclusive franchise; and it has been found that, as a general rule, the best results are obtained by granting an exclusive right. Indeed, it often is the case that on no other terms will the citizen assume the burdens incident to the operation of a ferry. There is nothing in the history of the English nation or of the American people which warrants the

conclusion that this practice has resulted in imposing intolerable burdens upon the public, or has led to other than beneficial results. No sentiment inimical to this practice is discoverable in any of the records to which the mind naturally turns as legitimate sources of information on the question of public sentiment on the subject. Public opinion has never crystallized against grants of exclusive ferry franchises. On the contrary, the spirit of the times appears to be as favorable to the long established practice of making such grants exclusive as in the early history of English jurisprudence. These considerations are of weight in interpreting section 20 of the constitution. Unless there has been a radical change in public sentiment in the matter of exclusive ferry franchises, we must not lightly assume, from the mere use of the word "privilege" in the constitution, that the people intended to take from the legislature a very important portion of the police power relating to public ferries,—such a branch of that power as has been exercised unchallenged for more than two centuries without oppression to the people, and generally with beneficient results. It may often happen that the best facilities and service can be secured, and the most reasonable schedule of tolls be obtained, by the grant of an exclusive franchise. What the law has regard to in the establishment of ferries is the good of the public, and not the right of the citizen to embark in the business of operating a public ferry. There is no such right. There was none at common law, and there is none now, unless by the use of the word "privilege," in section 20 of the constitution, it has been conferred upon the citizens of the state. That this is not the purpose of section 20 we are clear. Indeed, the very most that could be claimed would be that, if the state should see fit to open up the business at all to private enterprise, it must be opened up to all on the same terms. It could unquestionably, even on the theory of defendant's counsel, exclude all persons from engaging in such business, and enjoy the monopoly itself. The right of the citizen to maintain a ferry does not exist. To withhold the special privilege of engaging in that business as a

servant of the public and for the public good does not deprive him of any right recognized by the law. To grant this special privilege to another is no ground for complaint on his part. If he essays to cover his selfish desire for the privilege under the thin coat of championing the public interests against the oppression of extortionate tolls because competition is not present to control them, he is met with the conclusive answer that the whole matter of tolls is under the control of the state. No oppression will result from the monopoly. It is this fact, and the further facts that the right to operate a ferry is not a right common to all citizens, but may be granted or withheld at the pleasure of the state, and that it is always granted in consideration of public services which the grantee is under legal obligations to render,— it is these facts which have led the courts from the earliest times to except exclusive ferry franchises from the class of monopolies obnoxious to the common law. We think that under our constitution this distinction is perpetuated. We are of opinion that with respect to business enterprises the old line of delimitation is preserved, and not obliterated. This line has been so repeatedly drawn that we cannot infer a purpose to destroy this common boundary between monopolies injurious and those beneficial to society from the use of general expressions. Nothing short of explicit language will suffice to warrant such a conclusion. From the earliest times there has gone, hand in hand with the struggle against odious monopolies,—those which denied the right of the citizen to engage in those business enterprises which on principles of natural justice should be open to all,—an express recognition of the legality of those monopolies which related to business enterprises in which the citizen had no natural right to engage, as the business of operating a ferry. In the celebrated case of *Proprietors of Charles River Bridge* v. *Proprietors of Warren Bridge*, 11 Pet. 420, Mr. Justice Story has set forth this matter in very clear language. At page 607 he says: "But what is a monopoly, as understood in law? It is an exclusive right, granted to a few, of something which was before of common right. Thus a

privilege granted by the king for the sole buying, selling, making, working, or using a thing whereby the subject in general is restrained from that liberty of manufacturing or trading which before he had, is a monopoly. 4 Bl. Comm. 159; Bac. Abr. "Prerogative," F, 4. My Lord Coke, in his Pleas of the Crown (3 Inst. 181,) has given this very definition of a monopoly, and that definition was approved by Holt and Trevy (afterwards chief justices of king's bench), arguendo as counsel in the great case of *East India Co.* v. *Sandys*, 10 Howell, St. Tr. 386. His words are that a monopoly is an 'institution by the king by his grant, commission or otherwise, to any persons or corporations of or for the sole buying, selling, making, working, or using of everything whereby any persons or corporations are sought to be restrained of any freedom or liberty they had before, or hindered in their lawful trade'; so that it is not the case of a monopoly if the subjects had not the common right or liberty before to do the act or possess and enjoy the privilege or franchise granted as a common right. *Id.* 425. And it deserves an especial remark that this doctrine was an admitted concession pervading the entire arguments of the counsel who opposed, as well as of those who maintained, the grant of the exclusive trade in the case of *East India Co.* v. *Sandy's*, 10 Howell, St. Tr. 386, a case which constitutes in a great measure this basis of the law. No sound lawyer will, I presume, assert that the grant of a right to erect a bridge over a navigable stream is a grant of a common right. Before such grant, had all the citizens of the state a right to erect bridges over navigable streams? Certainly they had not, and therefore the grant was no restriction of any common right. It was neither a monopoly, nor in a legal sense, had it any tendency to a monopoly. It took from no citizen what he possessed before, and had no tendency to take it from him. It took, indeed, from the legislature the power of granting the same identical privilege or franchise to any other persons. But this made it no more a monopoly than the grant of the public stock or funds of the state for a valuable consideration." See, also, opinion of Mr.

Justice McLean in the same case at page 567. In the *Slaughter House Cases*, 16 Wall. 36, both Mr. Justice Field and Mr. Justice Bradley, who dissented on the ground that the statute of Louisiana, which was assailed in that case, created a monopoly, expressly recognized the distinction between a monopoly condemned by the common law and a monopoly resulting incidentally from the proper exercise of the police power by the grant of an exclusive ferry franchise. Mr. Justice Field says at page 88: "It is also sought to justify the act in question on the same principle that exclusive grants for ferries, bridges, and turnpikes are sanctioned, but it can find no support there. Those grants are of franchises of a public character appertaining to government. Their use usually requires the exercise of the sovereign right of eminent domain. It is for the government to determine when one of them shall be granted, and the conditions upon which it shall be enjoyed. It is the duty of the government to provide suitable roads, bridges, and ferries for the convenience of the public; and if it chooses to devolve this duty to any extent, or in any locality, upon particular individuals or corporations, it may, of course, stipulate for such exclusive privileges connected with the franchise as it may deem proper without encroaching upon the freedom or the just rights of others. The grant, with exclusive privileges, of a right thus appertaining to the government is a very different thing from a grant with exclusive privileges of a right to pursue one of the ordinary trades or callings of life, which is a right appertaining solely to the individual." See, also, opinion of Mr. Justice Bradley at page 111; *New Orleans Gaslight Co.* v. *Louisiana Light & Heat Producing & Manufacturing Co.*, 6 Sup. Ct. 252-257; *Gordon* v. *Association*, 12 Bush. 114; *Com.* v. *Bacon*, 13 Bush. 212; *City of Memphis* v. *Memphis Water Co.*, 5 Heisk. 525; *Crescent City Gaslight Co.* v. *New Orleans Gaslight Co.*, 27 La. Ann. 138-147; *Waterworks Co.* v. *Rivers*, 115 U. S. 674, 6 Sup. Ct. 273.

In view of this unbroken trend of judicial opinion that granting an exclusive ferry franchise is within the police power of a govern-

ment, and is not repugnant to natural justice, or injurious to the commonwealth, we are unable to spell out of the constitution a purpose to inaugurate, without assignable reason for the change, so radical an alteration of the law,—an alteration which would seriously impair the acknowledged power of the state over a subject which has so long been within the absolute control of sovereign power. Especially are we unwilling to do this when we consider that there has never been any public sentiment against the granting of exclusive ferry franchises on the ground that such a practice was detrimental to the public interests. There are some decisions which appear to be nearly in point. In *Blair* v. *Kilpatrick*, 40 Ind. 312, the constitution of that state declared that "the general assembly shall not grant to any citizen or class of citizens privileges or immunities" which upon the same terms shall not equally belong to all citizens." The contention was that the law authorizing the issue of liquor licenses was repugnant to this article of the constitution, because females were excluded from the class entitled to such licenses. The court said: "While we recognize females as falling under the designation of citizens, we do not think that the right to engage in the business of retailing intoxicating liquors is one of the rights contemplated by the section in the bill of rights which we have copied." The court referred to the section of the constitution we have quoted, and which is practically the same as section 20 of our constitution, so far as this question is concerned. See, also, *City of Laredo* v. *International Bridge & Tramway Co.*, 14 C. C. A. 1, 66 Fed. 246-248.

As the granting of exclusive ferry franchises is the proper exercise of the police power of the state, it follows that the fact that such a grant results incidentally in the establishment of a monopoly does not bring the grant within the prohibition of our constitution. It is not a business that any citizen has a natural right to pursue. The grantee is subject to the control of the state as to his charges. The franchise is given in exchange for the engagement of the grantee to perform important public

duties,—his promise to operate a public highway over which all may pass on the same terms. The decision of the court in *State v. Haworth*, (Ind. Sup.) 23 N. E. 946, appears to us to be in point. Indeed, it goes further than we might feel disposed to go if the question before us was the same as the one before the Indiana Supreme Court in that case. See, also, Cooley, Const. Lim. p. 488; Tied. Lim. § 105. In the sense of an unjust discrimination there is no grant of a special privilege to a citizen when he is vested by the sovereign power with the exclusive right to exercise some public function, as the maintenance of a ferry highway, and as compensation for the burden he assumes is allowed to charge such reasonable tolls as are fixed by law. The state, having the exclusive right to serve the public and charge tolls for so doing, transfers to a single citizen this right when it grants to him a ferry franchise, burdened with all the obligations to the public which grow out of the nature of the grant and are prescribed by law. The theory of the law is that the public receive an adequate consideration for the grant of the franchise. Whatever the grantee obtains, he pays for. He is no more the recipient of a special favor from the state than one who purchases property from the state. Under the statutes in force in this state he is obliged to pay an annual rent for the right he secures, and, unlike the grantee of a monopoly of a business purely private in character, he is under obligations to the public to furnish proper facilities to operate his ferry during specified hours, and to charge no more than the tolls fixed by statute. He is not the beneficiary of an unjust and impolitic grant of an exclusive privilege to carry on a private business over which the public have no control, and in the prosecution of which no public ends are subserved, but the purchaser, at a price commensurate with the right he buys, of a portion of the sovereign prerogative of the state to operate a public highway over public waters to the exclusion of every one to whom such right has not been granted. The monopoly which he secures is not one which the common law condemned. It is not injurious to the public. It is under public control. It is paid

for in cash, and in obligations to the public which the grantee assumes. It results as a mere incident of the exercise the of undoubted police power of the state. It deprives no citizen of any right he before enjoyed. It subjects the public to no greater charges than the state itself could exact. It merely places the grantee in the position which it is conceded the state would have occupied but for the grant. Such a monopoly, if monopoly it can be called, is not within the prohibition of our constitution. Another provision of that instrument appears to be very persuasive in support of our views. It is to be noted that section 20 does not, in terms, relate to a franchise. That word is not found in this section. When we turn to section 69, we find that the power to grant an exclusive franchise is expressly recognized. That section prohibits the grant of an exclusive franchise, and the chartering or licensing of ferries, toll bridges, or toll roads by means of a special or local law. Section 69, Subds. 16, 20. The irresistible implication is that exclusive franchises may be granted under general statutes such as the one whose constitutionality is here involved. Without attempting to mark the boundaries of the prohibition contained in section 20, it is sufficient for us to say that we are clear that it does not embrace the case of an exclusive ferry franchise.

It is urged that the lease of the plaintiff is void, because he was not the highest bidder. Defendant claims that his bid was higher than plaintiff's. Assuming this to be true, and also that defendant could raise the question in a proceeding of this character, we are yet unable to say that the board of county commissioners, in granting the franchise to plaintiff, violated the statute. It is not enough that one should be the highest bidder to entitle him to the franchise. He must also furnish security for the rent to be paid. This the plaintiff did. The record does not show that the defendant in this respect brought himself within the statute. There is no averment in the pleadings that he ever furnished or offered to furnish any security whatever. The mere fact that his bid was highest would give him no standing to claim

that the lease should be made to him. We cannot assume, in the absence of an allegation to that effect, that the board violated the law. On the contrary, we must assume that, if the defendant was the highest bidder, he was not given the franchise because he failed to comply with the requirements of the law as to security.

We see no force in the contention that the lease was not properly executed. It was made and signed by a committee of the board which was authorized to execute it on behalf of the board, provided another bidder whose bid was higher than plaintiff's failed to furnish security by a certain time. It is undisputed that he did fail to give the security required by the statute, and that thereupon the committee executed the lease to the plaintiff. Their action in this regard was subsequently approved by the board at a meeting of the board.

The claim that the lease was void because the ferry does not connect with a public highway on either shore is without merit. There is nothing in the case warranting the statement that there is no highway within the limits within which plaintiff is authorized to operate his ferry. But, if this were true, the franchise would not be void. A riparian owner cannot operate a ferry, although the landing place is upon his own property on both sides of the stream. Gould, Waters, § 142, and cases cited. But if he has a ferry franchise, and a highway abuts upon his property on each side, it is obvious that the public can be served as well as if the road ran to the shore. A ferry franchise is not void because the public at the time it is granted may not be able as a matter of legal right to reach the landing places of the ferry on either side of the river. Necessary highways can always be established, and if the owner of the franchise refuses to connect with the public highway, but operates the ferry from his own land, and imposes an additional burden on the public for the privilege of coming upon his land to embark, the state could, in a proper proceeding, have his franchise set aside for the breach of an implied condition of the grant. Whether there is a highway with which plaintiff

can cannect in running his ferry is a matter with which the defendant has no concern.

It is claimed that the plaintiff did not properly secure the rent he agreed to pay for the ferry lease. The bond is for $1,000, and the rent for the full term exceeds this sum. But the lease declares that the failure to pay the rent, which, under the terms of the lease, is due in semi-annual installments of $240.50 each, shall render the lease subject to annulment by the board. It is therefore obvious that the board was, so far as the amount of rent is concerned, amply secured. No more than $240.50 could ever be in default at one time, for the board had power, in case of default in the payment of the rent, to annul the lease, and grant a new one to the highest bidder, as before; thus stopping all increase of the lessee's obligation for rent. For this amount of $240.50 the bond for $1,000 was ample security. The order of the District Court is reversed, and that court is directed to enter an order granting the temporary injunction prayed for. All concur.