**T. S. ALPHIN and Alphin Aircraft, Inc.**
**v.**
**Richard HENSON and Henson Aviation, Inc. and City of Hagerstown, Maryland.**

**Civ. No. 73–449–T.**

United States District Court,
D. Maryland.

March 14, 1975.

Robert M. Beckman, Frank K. Smith, Washington, D. C., and Norman I. Broadwater, Hagerstown, Md., for plaintiffs.

George J. Goldsborough, Jr., and Broughton M. Earnest, Easton, Md., for defendants Henson and Henson Aviation, Inc.

Robert E. Kuczynski, City Atty., Daniel W. Moylan and William P. Nairn, Hagerstown, Md., for defendant City of Hagerstown.

THOMSEN, District Judge.

The several claims in this action under the antitrust laws, 15 U.S.C. 2, 15 and 26, originally brought by T. S. Alphin, d/b/a Alphin Aircraft (Alphin), against Richard Henson (Henson), and Henson Aviation, Inc. (HInc.), deal with the furnishing of aviation supplies and services on the Hagerstown Regional Airport, formerly called the Hagerstown Municipal Airport (the airport). By subsequent pleadings Alphin has added the City of Hagerstown as a defendant and Alphin, Inc. (AInc.) as a plaintiff, and has added a pendent jurisdiction claim. Henson and HInc. have filed a counterclaim against Alphin and a cross claim against the City.[1]

The following facts are found from the evidence admitted at the trial and inferences drawn therefrom, giving consideration to the credibility of the several witnesses.

## FINDINGS OF FACT

1. Hagerstown is the county seat of Washington County, in the narrow part of Western Maryland, where the Potomac River runs close to the Mason-Dixon line. The population of the City itself has been relatively static, 31,000 in

[1]. The original complaint was filed on May 4, 1973, by Alphin against Henson and HInc. In February 1974 an amended complaint was filed, adding the City as a defendant, and adding a pendent jurisdiction claim based on Art. 1A, § 13(e) of the Annotated Code of Maryland, now Art. 1A, § 7–701(e). The original defendants then filed a cross-claim against the City for indemnity or contribution. A second amended complaint was filed on May 23, 1974, elaborating the pendent claim against the City. Alphin incorporated his business on April 1, 1974, and on July 12, 1974, the Court authorized that corporation to be added as a party plaintiff.

After elaborate discovery, the case came on for trial before the Court without a jury on January 6, 1975. At the conclusion of plaintiffs' case, the several defendants moved for judgment under Rule 41(b), F.R.Civ.P. The Court ruled that plaintiffs had failed to prove that they were entitled to recover any damages from any of the defendants; but the Court denied defendants' motions for judgment with respect to the injunctive relief sought by plaintiffs. Henson and HInc. then dismissed their cross claim against the City. The findings of fact and conclusions of law set out herein deal with plaintiffs' pendent claim, as well as their claims under the antitrust laws, and with the counterclaim against Alphin filed by defendants Henson and HInc.

1930 and 36,000 in 1970. The "Hagerstown area", however, which runs into both Pennsylvania and West Virginia, has about 100,000 persons. The airport is some five miles north of the City and one mile south of the Mason-Dixon line.

### The Airport

2. In 1930 defendant Henson was employed as a test-pilot by Kreider-Reisner Aircraft Co., Inc., a manufacturer of aircraft and aircraft parts, now part of Fairchild Industries (Fairchild). In 1930 Henson "opened" a 40-acre airport on land then owned by Fairchild.

3. In 1934 the City purchased the airport from Fairchild. For some years the business of Fairchild expanded, but in more recent years it has declined. Over the years Fairchild has cooperated with the City by selling to it some parcels of land adjacent to the airport. Other land has been acquird by the City, and the airport has grown to 360 acres.

4. A plan of the airport and adjacent properties as they now exist is attached to this opinion as Exhibit A. The instrument runway runs east and west; the non-instrument runway runs roughly north and south. Exhibit A is based upon a preliminary layout plan which has been prepared by consulting engineers employed by the City in March 1973, whose final report is expected early in the present year. Exhibit A also shows some of the land which the engineers propose should be added to the airport, and which the City has the power to condemn under Art. 1A, § 7–701, Anno.Code of Md., Vol. 1, 1974 Cum.Supp.[2]

### Henson's Activities Through 1971

5. In 1931, while he was still employed by Fairchild, Henson began to operate a flying service at the airport. At that time, and in 1934, when the City bought the airport property from Fairchild, the only hangar at the airport was an old wooden hangar built in the 1920's, which Henson had leased from Fairchild, but which has since been torn down.

6. In 1936 the City built a hangar (no. 1 on the plan) and leased it to Henson. It is now being used as the airport terminal.

7. Henson's activities on the airport, most of which have been carried on through HInc.,[3] expanded over the years, although Henson also continued to work for Fairchild until 1964, when he began to devote his full time to his airport interests. For some time before as well as after 1964 Henson and HInc. had a fixed base operation (fbo)[4] on the airport. They provide line service (sale of fuel, oil and lubricants),[5] flight training, ground school training, aircraft rental, tie down service, aircraft parking, aircraft repair and maintenance, avionics, a small amount of aircraft sales, air taxi and charter services, and a commuter service operated in connection with Allegheny Airlines.[6]

2. Formerly Art. 1A, § 13. See Friendship Cemetery v. City of Baltimore, 197 Md. 610, 81 A.2d 57 (1951).

3. In the 1950's Henson formed a corporation to conduct his operations on the airport. That corporation, which is the corporate defendant herein, first called Henson, Inc., and later Henson Aviation, Inc., will be referred to herein as HInc. In 1971, Henson and the Magazine brothers formed a holding company, in which Henson has a 45% interest, which acquired all the stock of HInc. The holding company also operates the Friendship Flying Service at the Baltimore-Washington International Airport.

4. "A fixed base operation is one that provides facilities, fuel, equipment, supplies and services at an airport which are used by aircraft, crews, passengers and in handling freight connected therewith. It is vital to air transporation." E. W. Wiggins Airways, Inc. v. Massachusetts Port. Auth., 362 F. 2d 52, 53 n. 2 (1 Cir. 1966). The evidence in the instant case supports that definition, although what is encompassed in an fbo has changed somewhat over the years.

5. Henson and HInc. have used trucks to carry fuel to the aircraft. In some airports of comparable size the aircraft go to the pumps.

6. All the operations of Henson and HInc. have been conducted on the airport except

8. By a lease executed in 1948, modified in 1949, the City leased the airport to Henson. In 1952 a new lease for a period of three years was executed, this time to HInc., wherein, for a rental of $2,000 a year, HInc. was given the right to control all selling privileges and concession rights on the airport and in the City hangar, subject to various provisions.[7] The lease specifically provided: that it should not be construed as granting HInc. any exclusive right to conduct any activity at the airport involving the use of the landing area contrary to Section 303 of the Civil Aeronautics Act of 1938; and that the lease "shall be subordinate to the provisions of any existing or future agreement between the City and the United States, relative to the operation or maintenance of the airport, the execution of which has been or may be required as a condition precedent to the expenditure of Federal funds for the development of the airport". After the expiration of the lease, HInc. held over as a tenant, at rentals increased from time to time, until a new lease was executed in 1972. Until 1972 no one else asked the City officials for a lease of the airport or any part thereof, or complained to the City of the terms of the arangement with Henson or HInc.

9. In 1954, HInc., the Landis Tool Company and the City worked out an unusual arrangement whereby Landis built a hangar (no. 2 on the plan) on the airport, conveyed its interest in the hangar to HInc, and leased it back, with a provision that the City might purchase the hangar at any time at its depreciated value, in which event HInc. would make a specified adjustment with Landis. The arrangement was satisfactory to all three parties and was repeated in 1961–2, when Landis built a larger hangar (no. 3 on the plan) and terminated its lease of the smaller hangar, which became the avionics building.

10. In 1959 Henson built a T–hangar (no. 4 on the plan) on airport land leased by the City to Henson, who borrowed the money to build the hangar. Henson agreed to pay the City rent based on his receipts from its use. In 1961 Henson purchased from Fairchild a plot of land just west of the first T–hangar, and over a period of several years built four more T–hangars thereon (Nos. 5, 6, 7 and 8 on the plan). In 1971, those hangars and the land on which they were built were deeded to the City, along with Henson's interest in other hangars on City land.

11. Henson acted as airport manager, with the knowledge and approval of the City officials, in dealings with the Federal Aviation Administration and with other persons and corporations, although no written agreement formally designating an "airport manager" was signed until May 1972, when HInc. (the corporate defendant) was so designated.

12. It is the usual practice, in Maryland and elsewhere, for cities of the size of Hagerstown or somewhat larger, to have the fixed base operator act as airport manager; the evidence does not show, however, that it is the general practice for such fixed base operator to negotiate on behalf of the City with potential competitors.

13. The agreement between Henson and the Magazine brothers (see n. 3,

---

the carrier operation, which has an office on the airport, but also serves four other cities.

7. HInc. agreed during the term of the lease: to furnish good, prompt and efficient service adequate to meet all demands for its service at the airport; to furnish such service on a fair, equal and nondiscriminatory basis to all users; and to charge fair, reasonable and nondiscriminatory prices for each unit of sale or service, subject to the right to

make reasonable and nondiscriminatory discounts, rebates or price reductions to volume purchasers. Henson allowed substantial discounts to Alphin for material purchased by Alphin from HInc. over the years.

The lease also prohibited the granting of concessions which (a) would extend beyond the term of the lease, or (b) were not reasonably necessary in the operation of the airport, or (c) were not in accord with the usual standards of good airport management.

above), under which a holding company, in which Henson has a 45% interest, acquired all of the stock of HInc., became effective in April 1971.

## FAA

14. Since the City obtains financial assistance from the federal government for the airport, the Federal Aviation Administration (FAA) has the responsibility to see that applicable federal laws and regulations are complied with, including the preservation of minimum standards and the policy against the granting of exclusive rights at an airport. Representatives of FAA visited the airport from time to time, and the Regional Office of FAA was familiar with the arrangements between Henson and the City. Over the years FAA has dealt with Henson as the representative of the City on the airport and has not found that the relationship of Henson with the City, nor the operations which Henson and HInc. conducted on the airport, violated the "non-exclusivity" provisions of any applicable law or policy. The relevant laws and policies which FAA is charged with enforcing are set out in Exhibit B, at the end of this opinion.[8]

### Alphin's Activities Through 1971

15. Alphin is a capable aircraft mechanic. He worked for the Government from 1942–1946, then moved to Hagerstown to work for Fairchild. Shortly thereafter Henson employed Alphin to do maintenance and repair work for Henson on the airport and to be manager of that part of Henson's business.

16. In 1948 that work dropped off; Alphin wished to do aviation maintenance and repair work on his own, and Henson was glad to turn over his repair work to Alphin, with the understanding that Alphin would give it prompt attention. Accordingly, Henson subleased to Alphin the old wooden hangar which Henson had leased from Fairchild.

17. In late 1952 Henson's lease of the wooden hangar terminated, and Fairchild reoccupied it. Alphin would have liked to build a shop on the airport, but Henson told him there was no space available at that time. Alphin did not take the matter up with any City official, but arranged with Henson to do part of his (Alphin's) maintenance and repair work in the City hangar (then the only hangar on the airport except the wooden hangar) and to store his materials there. He moved some of his tools and equipment to his home, where he did maintenance and repair work on aircraft which he brought to that location, working at first in the basement of his home and shortly thereafter in a garage which he built.

18. At about the same time Alphin discussed with Henson the possibility of Alphin acquiring privately owned property (no. 9 on the plan, now occupied by the Civil Air Patrol), adjacent to the north boundary of the airport, a short distance north of the City hangar. Henson said that he would not allow Alphin access to the airport from that site, and Alphin did not attempt to go over Henson's head to any City official in connection with his request.

19. Alphin returned to work for Fairchild in March 1953, but continued to do maintenance and repair work on his own, in the City hangar and in his own garage. He is particularly skillful in the repair and rebuilding of badly damaged aircraft, which are hauled to his shop. He continued this operation after he was laid off by Fairchild in 1959. He would have liked to have a shop on the airport property, but Henson told him that no suitable space was available. It is true that no suitable space in a building was available except the space Alphin already had in the City hangar, and Alphin did not ask the City or any City official to rent him space to build a shop.

20. In 1962 Alphin leased from Henson the northern portion of the first

---

8. FAA is not charged with the enforcement of the antitrust laws.

T–hangar which Henson had built on the land he had purchased from Fairchild (no. 5 on the plan). Henson caused that portion of the hangar to be built wider than the other parts, so that Alphin could use it more effectively for the maintenance and repair work he was doing.

21. In 1966 Alphin purchased a portion of a tract of land (nos. 10a and 10b on the plan) extending from Oaks Road to Route 11 as it now runs. The western portion of the tract (10a), which is immediately across Oaks Road from the airport property, is now occupied by six buildings, five of which were built by Alphin between 1966 and 1973.[9] Alphin conducts his maintenance, repair and reconstruction activities from that location, although he still uses the portion of the T–hangar which he first rented from Henson in 1962.

22. When Alphin purchased his present location in 1966, there was a rough road on the airport leading from a point on Oaks Road opposite the west side of Alphin's property to the south side of the east-west runway. The road had been prepared for trucks hauling fill on the airport.

23. With Henson's permission, Alphin placed gravel on the road, and later, with the permission of and supervision by Van Eykelbosch, the City Engineer, Alphin employed a contractor to grade and surface the road, making it a reasonably satisfactory taxiway from the east-west runway to Alphin's property, and also suitable for hauling materials to and from the portion of the T–hangar leased to Alphin.

24. Alphin ties down planes on which he is working, has worked or is about to work, either on his own property or on the airport property on both sides of the taxiway just across Oaks Road from his property (nos. 11a and 11b on the plan). He pays very little in tie-down fees to the City, because he contends that tie-down fees are not payable on aircraft waiting repair or under repair. The City officials disagree with that position and the dispute has not been resolved.

### The Interim Airport Authority and The Research Group, Inc. (1969–1971)

25. Neither the citizens of Hagerstown nor its officials showed much interest in the development or management of the airport until 1969. In that year, at the suggestion of the Chamber of Commerce, a Hagerstown-Washington County Interim Airport Authority was appointed to "function as a liaison unit to the City and County governmental units . . . (and) study . . . the airport operations and problems". Henson was an adviser to the interim authority.

26. The Maryland Department of Economic Development assisted the City of Hagerstown and Washington County by obtaining funds from the Appalachian Regional Commission to finance this study, and then entered into a contract with The Research Group, Inc. to render the necessary professional and technical services. FAA concurred in the general arrangement.

27. The Research Group, Inc. submitted two progress reports, and in May 1971 presented an 80-page report, with two appendices, and an introduction, overview and summary of recommendations. The recommendations included the following:

"1. To adequately and effectively maintain and expand the airport serving Hagerstown and Washington County, new ownership policy, management and financial arrangements should be adopted. Transfer of airport ownership and primary support to Washington County is recommended."

9. Alphin has a gentleman's agreement with the seller not to build any commercial buildings on the east half of the land. There is still a little room, however, for some additional building on the western half, but not enough for a hangar.

"2. A development policy and plan should guide decisions on public and private investment in the airport area."

"10. Terminal facilities for Hagerstown air carrier service are inadequate and a new terminal structure should be designed and constructed."

"12. Four new leases should be drawn and executed. One should describe the responsibilities of the Fixed Base Operator in business at Hagerstown Municipal Airport and his ground and structure rents, duties, and obligations. Another should describe the agreement between Allegheny Commuter Airlines and the airport policy board for new terminal and terminal area space. A third lease should be executed between Alphin Aircraft and the airport policy board for ground rent and taxiway access. The fourth lease should describe the privileges and payment arrangements with Fairchild Hiller Corporation for property and access."

28. With respect to Alphin, that report stated: "A lease for $1,000 annually is recommended for rental of city land and taxiway access for Alphin Aircraft, provided no change in present aircraft rebuilding operations is anticipated.[10]

29. On September 30, 1971, the Interim Airport Authority wrote to the Mayor and City Council and the County Commissioners enclosing copies of the report, stating that there had been some fundamental differences in concepts, and referring to a meeting to be held to discuss the report. The Interim Airport Authority stated "that two items deserve careful consideration regardless of how the ownership of the airport finally evolves". Those items are set out in the margin.[11]

*Events Between October 1971 and the Filing of the Original Complaint in this Action in May 1973*

30. The proposals in the report of the Research Group (see Findings 27, 28, above) and those in the letter of the Interim Airport Authority (see Finding 29

10. Those operations were, as indicated in Findings 19–24, the tie-down on airport property opposite Alphin's plant of aircraft under repair or awaiting repair or being otherwise worked on by Alphin, and the use of the taxiway and other portions of the airport for bringing aircraft and supplies from other places on the airport to Alphin's property or to the portions of the airport then being used by Alphin for tie-down of aircraft, as aforesaid. Alphin also rents storage space in a T-hangar.

11. Those recommendations of the Interim Airport Authority were:
"1. We recommend that a citizens type Airport Commission be appointed by the governmental body owning the airport for the study of programs needed, negotiating contracts with airport tenants, overseeing commitments to these contracts, and in general be responsible to the elected officials for the proper progress and operation of the airport. (As examples, a program of this type has been successful at Salisbury, Maryland, and our own Washington County Economic Development Commission.)
We recommend that the present Interim Airport Authority be dismissed and the new Airport Commission be appointed with its membership to include representatives as follows:

a. 1 Representative from Hagerstown City Council.
b. 1 Representative from Washington County Commissioners.
c. 1 Representative from General Aviation Users of the Airport.
d. 4 Representatives from Business Community at Large.
This Commission should be given definite guidelines for operation by the governing bodies and instructed to begin implementing the 'Outline for Action' not later than January 1, 1972.
"2. We recommend that the Fixed Base Operator be considered the Resident Airport Manager and that his lease be negotiated on this basis.
In such an arrangement, the airport management would be serving at no out-of-pocket cost to the airport owner(s). This type of arrangement has been, and continues to operate in all of our neighboring cities, including Cumberland, Winchester, Martinsburg, Chambersburg, Frederick, Easton and Salisbury.
We cannot afford to experiment with programs less professional than that which has proven successful at our and other communities in our area."

and note 11) received wide publicity in the Hagerstown newspapers. Mayor Mills was negotiating a management contract with Henson, and a public meeting was held by the City Council on February 14, 1972, to discuss the proposed contract.

31. At the February 14 meeting various views were advanced.[12] Alphin expressed concern that his "rights" might not be protected if Henson were appointed airport manager, and was told by members of the Council that Henson would be acting as a City agent and that any disagreements could be taken up with the Council.

32. Two agreements between the City and HInc. were drafted during the early part of 1972 and executed under date of and effective May 1, 1972, pursuant to a resolution of the Council.

(i) One was a lease to HInc. as a "fixed base operator", granting it the exclusive use of specified portions of the airport for fixed base operations, and non-exclusive use for other activities theretofore conducted by HInc., with certain specified requirements to be observed by it. Under that agreement HInc., as the fixed base operator, obligated itself to furnish all items generally included in a full fbo. FAA assisted in drafting portions of this agreement and did not object to it.

(ii) The other was a contract between the City and HInc. for the services of

that corporation as a "Management Corporation to fully manage financially and operationally all aspects of responsibilities" in designated areas. It is an elaborate document, which is not illegal (see Conclusion 2, below), nor unreasonable except insofar as it might be interpreted to permit the management corporation to negotiate on behalf of the City with persons who would be prospective competitors of the management corporation in its own operations under its lease. The provisions of the management contract set out in the margin [13] would appear to discourage, even if they do not expressly prohibit, such negotiations by the management corporation with potential competitors. (See Finding 14 above, and Exhibit B at the end of this opinion). Nevertheless, during 1972 and 1973, with the knowledge of the then Mayor, Henson, as president of the management corporation, negotiated with Alphin and other persons desiring space on the airport for various activities which would compete with HInc., although final decision on any such application was to be left with the City officials. FAA knew that Henson was conducting such negotiations and did not object to his doing so.

33. On May 8, 1972, Alphin, through John M. Colton, Esq., of Hagerstown, an experienced attorney, wrote Henson with respect to a proposed lease he and Alphin had discussed with Henson a

12. On December 14, 1971, the President of Fairchild had written Herman L. Mills, then Mayor of Hagerstown, recommending that Henson be appointed airport manager, stating that a proposed lease arrangement between Fairchild and the City appeared fair and reasonable, and suggesting that the City consider some financial participation from other corporate users of the airport. He referred to the need for improving the existing airport operation, to keep abreast of the growing community, and stated that "the proposed operational plan may be considered our first step toward that goal".

13. "3. This Contract Agreement shall be subordinate to the provisions of any existing or future agreement entered into between the City and the United States to obtain Fed-

eral aid for the improvement or operation and maintenance of the airport.

"4. It is agreed that the Federal Aviation Administration will at all times look to the airport owner for effecting such actions as may be required to conform to the owner's compliance obligations. This Management Corporation which is authorized to perform the owner's management responsibilities, shall be considered as resident agents of the airport owner and not as responsible principles.

"5. It is understood that this Contract Agreement is made subject to such approval by the Federal Aviation Administration as required by law."

These provisions limit the duty given the airport manager to negotiate contracts between the City and commercial enterprises using the airport.

few days before. In substance, Alphin asked only for a lease permitting him to do what he was already doing without a lease, except that he wished to enlarge the area which he was using for tie-downs. The letter requested that six items be included in the lease.

"1. Access on and off the airport property to Alphin's hangar and place of business for Alphin, his employees, invitees and customers.

"2. Mr. Alphin would like space for tie-downs for his own aircraft as well as aircraft of his customers and invitees, as may be necessary. He would like use of the parcel of land lying west of his property and between his present taxiway and the Fairchild fence. It would be his responsibility for any damage to planes in this tie-down area, and not the responsibility of the airport operator.

"3. Naturally, the Lease will provide for abiding by the provisions of the Airport Master Plan.

"4. Mr. Alphin has already graded and laid gravel on the taxi-way leading to his hangar. The Lease will provide for his black-topping this taxi-way, to be completed over the next five years. The maintenance and upkeep of this taxi-way would be his responsibility. He would also be responsible for snow removal from his taxi-way and cutting grass on the tie-down area, which would include the grass immediately adjacent to his taxi-way.

"5. We suggest the duration of the Lease be for a period of twenty (20) years at an annual rental of One Thousand ($1,000.00) Dollars per year for all items enumerated above.

"6. This Lease will contemplate Alphin's carrying proper insurance and being governed by FAA regulations."

34. Colton enclosed with his letter Alphin's check for $85 payable to Henson as "Airport Manager" to be applied for the month of May on the proposed $1,000 a year rental agreement. Alphin has continued to make the monthly payments ($75 for the eleventh and twelfth months) ever since. They have been forwarded to the City and placed in the Airport Trust Fund, as other moneys were. See n. 16, below. Alphin made no other request of Henson or the City at that time. Alphin continues to conduct the various operations referred to in Colton's letter.

35. On November 30, 1972, Henson sent Alphin a form of lease which contained a number of provisions to which Alphin objected.[14]

36. Sometime during December 1972, Alphin retained his present counsel, who on December 26, 1972, wrote Mayor Mills applying for lease of space and grant of privileges to conduct a fixed base operation at the airport, including the sale of fuel and oil. The letter referred to the proposed operation as a "full" fixed base operation; in fact, it asked for the space and privilege to conduct *any* of the activities included in a full fbo, although Alphin intended to perform only the more profitable ones.

The letter erroneously stated that there was "a heavy demand for additional service and facilities on the airport" and that "[e]xisting facilities [were] inadequate to meet the demand". The only unsatisfied demand which the Court finds to have been proved was for additional hangar space for inside parking of private aircraft, and Alphin did not in-

---

14. The provisions to which Alphin objected included:
A rental of $2,000 a year.
"Privileges not granted:
"(A) The storage and sale of aviation fuels and oils. (Alphin had been selling oil in connection with his maintenance and repair work but had not been selling fuel.)

"* * *
"(G) Retail sale and installation of aircraft radio and other accessories. (Alphin had been doing this off the airport, sometimes buying avionics and other accessories from Henson at a substantial discount.)
"(H) Any and all operations not specifically granted."

tend to build any hangars for that purpose.

The letter requested information as to what space was available and the terms and conditions which the City proposed to include in a lease.

The letter stated: "It is obviously improper for Henson Aviation, Inc., to act on behalf of the City in negotiating the contract for a competitive service", and argue that "the purported delegation by the City to Henson Aviation, Inc., of such authority is void under Maryland law". The letter requested a meeting with a duly authorized official of the City to negotiate immediately for a competitive fixed base operation.

37. Prior to the December 26, 1972 letter, Alphin had never requested a full fixed base operation nor the right to sell fuel on the airport.

38. The income tax returns of Alphin and his wife show that during the years 1968 through 1972 Alphin's net profit from his business ran from $6,638 to $15,332.

39. The Court observed Alphin on the stand for three days, and finds that, although he is an excellent mechanic, he is not a good business man.

40. Alphin offered the testimony of three men who said that they were willing to finance him in a fixed base operation at a suitable location on the airport. None of them testified whether they intended to lend the money or buy stock in a corporation.[15] The Court finds that it is unlikely that any of them would finance the suggested venture.

41. The Court finds that the December 26, 1972, letter (see Finding 36) was principally intended to help establish a claim for violation of the antitrust laws.

42. Mayor Mills sent the letter to Henson, who in turn sent it to the City Attorney. On January 3, 1973, Henson sent to the Mayor and all Councilmen an elaborate statement of the factors which he believed important in considering Alphin's new request. He recommended that the proposal be rejected for reasons which he stated, including: (1) that Alphin wanted the right to engage in the more profitable portions of a full fixed base operation (particularly the sale of fuel), without agreeing to furnish the less profitable services which HInc. was required to furnish under the terms of its lease agreement; and (2) that it was desirable to update the master plan before leasing to anyone space for a full fixed base operation.

43. The Court finds on all the evidence that the City was and is justified in not accepting the proposal contained in Beckman's letter of December 26, 1972, and in not making any long term commitments with respect to space on the airport until a final layout plan is adopted.[16]

44. On the other hand, the Court finds that Henson's objection to Alphin's proposal was based in part upon Henson's reluctance to have competition for the more profitable services which were a part of the package of services which HInc. was then furnishing.[17]

45. A city election was impending; it resulted in a new Mayor, who took office early in April 1973.

46. Meanwhile, on January 26, 1973, Henson met with Alphin and his present counsel, and discussed possible sites for an fbo, as well as the proposal Alphin had made through his previous counsel in 1972. At that meeting and ever since Alphin and his present counsel have

---

15. Alphin's present counsel caused Alphin to incorporate his business in April 1974.

16. It should be noted that when the Grove Manufacturing Company sought in November 1973 an option to rent land for a corporate hangar in the area now designated for corporate hangars on the preliminary layout plan, the City refused to grant such an option, but by mutual agreement between the City and Grove placed the check for $2,000 which Grove tendered in the airport trust fund.

17. The propriety of the designation by the City of Henson as the person to negotiate with Alphin will be discussed below.

insisted that Alphin be allowed to rent at once the large area designated as nos. 12a and 12b on the plan (Exhibit A), which is and has been for some time reserved for other uses, at one time for an administration building, and more recently partly for corporate hangars (12a) and partly for automobile parking (12b), because it is adjacent to the road and is near the terminal building and the motel.[18] The Court finds that the demand by Alphin's counsel for a lease of that space at that time or at this time is unreasonable, in view of the fact that an airport layout plan was in January 1973 and is still under preparation. A preliminary airport layout plan, dated October 4, 1974, was offered in evidence and the final plan is expected early this year (1975).[19]

47. On February 6, 1973, Beckman wrote Mayor Mills a letter, asking again to deal directly with the City, suggesting that the Mayor and his "colleagues on the City Council" were "acting in violation of Federal law and State law and were exposing the City and themselves personally to penalties for such violation". Beckman also wrote a similar letter to Henson. Henson replied on February 19, outlining his view of the negotiations he had had with Alphin and Alphin's attorneys, and expressing a willingness to continue negotiations "in relation to his original desires or that of a full fixed base operation". Beckman replied to Henson, again objecting to having to deal with him rather than a City official.

48. At a meeting held on February 26, 1973, attended by Alphin, Beckman, Henson, Mayor Mills, City Attorney Oswald and two men from FAA, complaints were voiced by Alphin's attorney against the City and by the City Attorney against Alphin. Henson suggested an area north of the western portion of the east-west runway for Alphin's operation (no. 14 on the plan). Alphin rejected it. The absence of a road or taxiway leading to that area justified Alphin's rejection.

49. FAA did not conclude that the City was being unreasonable in not leasing to Alphin the area which Alphin was seeking, and in wishing to wait for the completion of the master plan and a determination of how new facilities would be financed before entering into long term leases.

50. Other persons were interested in leases on the airport for various commercial activities, ranging from an engine repair shop to a full fixed base operation. Letters from three such persons written in 1973 were offered in evidence

*From the Filing of the Original Complaint Herein on May 7, 1973, to Trial in January 1975*

51. On May 7, 1973, Henson sent Alphin a form of lease, similar to proposed leases he was offering or prepared to offer to other applicants for space on the airport to conduct a full fixed base operation. Alphin testified that it was this letter and proposed lease which prompted him to direct his attorney to file suit. In fact, however, Alphin's original complaint against Henson and HInc. had been filed in this Court on May 4, 1973. Service of process was made on May 10.

---

18. It is so designated on the preliminary airport layout plan prepared by the consulting engineers.

19. During the negotiations between Alphin, his present attorney and Henson, Henson suggested that Alphin might be able to purchase or rent a part of the Schindel farm (no. 13 on Exhibit A), and offered to see whether the Schindels, who are related to him, would be willing. The Schindels, however, are unwilling to sell or lease part of their farm. The City, reasonably, does not wish to condemn any property until the final layout plan is adopted. Alphin's present counsel questions the power of the City to condemn land outside the City, despite Art. 1A, § 7–701, Anno. Code of Md., Vol. 1, 1974 Cum.Supp., and Friendship Cemetery v. City of Baltimore, 197 Md. 610, 81 A.2d 57 (1951).

52. The proposed lease was for a full fbo, granting the operator the right to conduct and requiring him to conduct the operation for a period of 20 years. No specific location nor amount of rent was specified. Most of the requirements in the proposed form of lease were not inherently unreasonable, although Alphin reasonably objected to some of them. Basically, Alphin did not want to be required to conduct the same fbo as was being conducted by Henson. He wanted to be able to sell fuel and conduct the other profitable operations, without the obligation to offer the less profitable services which Henson was offering.

53. On the other hand, the terms which Henson proposed in the drafts of leases sent to Alphin in November 1972, and to Alphin and one or more others in May 1973, would have handicapped if not prevented Alphin and the others from effectively competing with HInc. and were intended by Henson to have such effect.

54. On May 17, 1973, Beckman wrote Mayor Paddock, who had taken office in April, stating his objections to the lease proposed by Henson and calling on the Mayor to establish a Municipal Airport Board to operate the airport, with whom Alphin "can negotiate a fixed base agreement in the best interests of the City".

55. Mayor Paddock replied on July 24, explaining the delay in answering the letter and stating: that the airport matter had been reviewed and discussed with FAA and with airport personnel; that he understood Beckman had some reluctance in dealing with Henson; and that the Mayor and Council, as the ultimate authority, were more than willing to discuss Beckman's request at his earliest convenience. The Mayor suggested that Beckman prepare a specific proposal.

56. Alphin's proposal was not submitted to the City until May 1974, after Alphin had joined the City as an additional defendant in this case in February 1974.[20] Alphin blames the delay in submitting his proposal to the failure of the City to tell Alphin what land would be available for him. This Court finds, however, that the City was justified in not selecting a particular area to be leased to Alphin: (1) because it is in the public interest not to enter into any long term leases with anyone until the layout plan has been finally submitted and discussed; (2) because other persons are interested in obtaining a lease or other contract to furnish some or all services on the airport which would be included in a fixed base operation; (3) because Alphin wishes to have the right to furnish only those services which he believes would be profitable, and it has not been shown that a full fixed base operation, such as HInc. now furnishes, could be conducted profitably if a competitor were allowed to furnish only the more profitable elements thereof; and (4) the City has the duty to consider the public interest in these and other questions.

57. In the latter part of 1973 the Grove Manufacturing Co., a large employer in the Hagerstown area, approached Henson in an effort to obtain a lease of a part of the land which Alphin wants. Grove wished to lease the land to

---

20. Alphin's proposal to the City was made in the name of his newly chartered corporation, Alphin Aircraft, Inc. (AInc.). After a preliminary history and discussion, the proposal sought a lease of the land east of the Landis hangar (see Findings 46 and 57), as well as the existing taxiway and the parking and tie down area which AInc. now uses (see Finding 24). The proposal was that AInc. agree to erect hangars and support facilities on the airport, said buildings being valued at no less than $300,000, and upon completion deed them to the City in consideration of AInc.'s right to occupy the buildings for 30 years, and to have the right to engage in specified aeronautical activities and other services to be rendered to the public as the need for such services is recognized. Findings 39 and 40 apply to this proposal; but see n. 23, below.

build a corporate hangar, with adjacent parking area, which is the use for which the land is tentatively assigned. Grove tendered to Henson a check for $2,000 for an option, which the City refused to grant. By agreement of Grove and the City, the check was deposited in the Airport Trust Fund, without obligation on the part of the City to enter into the proposed lease.

58. In 1974, Smith, one of Alphin's present counsel, complained to the FAA that the proposed location of the glide slope (a component of the instrument landing system) south of the east-west runway would require the relocation of the taxiway used by Alphin, and that the location was chosen by Henson and the City for an improper purpose. FAA investigated and found that the taxiway would have to be relocated even if the glide slope were located north of the runway, as Alphin requested and as it was finally located. FAA found no violation of its rules and this Court finds no improper motivation for any position taken by the City or Henson in connection with the location of the glide slope.

## DISCUSSION AND CONCLUSIONS

The general principles established by the courts in construing the antitrust laws are well known and need not be repeated. See United States v. Grinnel Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); United States v. First Nat. Bank & Trust Co., 376 U.S. 665, 84 S.Ct. 1033, 12 L.Ed.2d 1 (1964); United States v. Philadelphia National Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963); Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); United States v. du Pont & Co., 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); Lorain Journal Co. v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951); Schine Theatres v. United States, 334 U.S. 110, 68 S.Ct. 947, 92 L.Ed. 1245 (1948); American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); United States v. Aluminum Co. of America, 148 F.2d 416 (2 Cir. 1945).

■ It has been held that the antitrust laws are aimed at private action, not at governmental action; that states, cities and governmental agencies cannot be held liable for violations of the antitrust laws; and that restraints of trade which arise from valid governmental action cannot give rise to private antitrust liability. Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943); Wiggins Airways, Inc. v. Massachusetts Port Authority, 362 F.2d 52 (1 Cir. 1966); George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc., 424 F.2d 25 (1 Cir. 1970); Ladue Local Lines, Inc. v. Bi-State Development Agency, 433 F.2d 131 (8 Cir. 1970); Padgett v. Louisville and Jefferson County Air Board, 492 F.2d 1258 (6 Cir. 1974); and cases cited in those opinions.

In *Wiggins Airways,* supra, the Massachusetts Port Authority entered into an exclusive lease with a private corporation for the fixed base operations at Logan Airport in Boston, thereby precluding other private corporations from participating in those activities. The First Circuit concluded: "It is clear that in [executing the lease, the Port Authority] was acting as an instrumentality or agency of the state, pursuant to the legislative mandate imposed upon it to operate and manage the airport and establish rules and regulations for its use". 362 F.2d at 55.

In the instant case the City has been operating the airport under Art. 1A, § 13 (now § 7–701) of the Maryland Code.

### The Monopoly Issue
### Contracts Between the City and
### Henson or HInc.

Henson developed over the years a monopoly, in the popular sense of the term (see United States v. Griffith, 334 U.S. 100, 106, 68 S.Ct. 941, 92 L.Ed.

1236), in some but not all commercial aeronautical activities on the airport.[21]

■ Conclusion 1. Insofar as any monopoly which Henson and HInc. have enjoyed is the result of the leases which the City entered into over the years with Henson individually or with HInc.; it is not a monopoly which is unlawful under the antitrust laws; the City had and has the right to decide whether it is in the best interest of the public to enter into such leases with one or with two or more persons or corporations. Wiggins Airways, Inc. v. Massachusetts Port Authority, 362 F.2d 52 (1 Cir. 1966); and other cases cited in the second paragraph under the heading "Discussion and Conclusions", above.

■ Conclusion 2. Moreover, the City had the right to designate Henson or HInc. as the airport manager. The evidence shows that it is common practice in Maryland and elsewhere for cities the size of Hagerstown to have the fixed base operator act as airport manager. FAA has been familiar with the agreements which the City has had with Henson and HInc. over the years, including the 1972 agreements, and no objection thereto has been made by FAA officials or other personnel. For a further description of the management contract, see Finding 32(ii).

### The Conspiracy Issue

■ The fbo lease between the City and Henson Aviation, Inc., did not grant Henson or HInc. any exclusive right to furnish fbo services on the airport. Plaintiffs have failed to prove that the contract designating HInc. as airport manager was intended by the City to authorize Henson or HInc. to prevent other persons desiring to furnish fbo services on the airport from dealing directly with the City for such privileges. City officials knew that Henson was negotiating with Alphin and others, including Fairchild, Grove, Colaluca and Van Tries, during 1972 and 1973, but it has not been shown that any of the applicants except Alphin objected to negotiating with Henson. Alphin, through his new attorney, made his first such objection to the City during the last month of the old administration. When the objection was renewed in the first days of the new administration, and the new Mayor had had a reasonable time to investigate the matter, he invited Alphin and his counsel to deal directly with the City officials rather than with Henson with respect to the proposed lease to Alphin of space on the airport.

Conclusion 3. Plaintiffs have failed to prove any conspiracy in violation of the antitrust laws between the City or any of its officials and Henson or HInc.[22]

### Attempt to Monopolize

■ Conclusion 4. When Henson, as airport manager, undertook to represent the City in negotiating a lease with Alphin and others who wished to furnish some fbo services on the airport in competition with Henson or HInc. (which Henson did during a period of a year or so before July 1973) and proposed to Alphin and others terms which would have tended to protect from competi-

---

21. Alphin and others, including Fairchild, used the airport property to some extent in various ways, e. g., for tying down aircraft and storing supplies in connection with some fbo services or other commercial activities which they rendered or conducted, principally off the airport, but to a limited extent on the airport.

22. In the recent case of United States v. Standard Oil Co. of California, 362 F.Supp. 1331 (N.D.Cal.1973), aff'd 412 U.S. 924, 93 S.Ct. 2750, 37 L.Ed.2d 152 (1973), an injunction was issued against Standard Oil of California because the Court concluded that So. Cal. had violated the Sherman Act by engaging in a continuing combination and conspiracy with various persons, including certain officials of the Government of American Samoa and to private corporations (Van Camp and Star-Kist) to unreasonably restrain and monopolize the distribution and sale of petroleum products in American Samoa.

tion the business which Henson Aviation, Inc. then had on the airport, he went beyond the limits permitted by the antitrust laws. Cf. George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc., 424 F.2d 25 (1 Cir. 1970).

Conclusion 5. The Court·has found that the terms which Henson proposed in the drafts sent to Alphin in November 1972 and to Alphin and one or more others in May 1973 would have handicapped if not prevented Alphin and the others from effectively competing with HInc., and were intended by Henson to have such effect. The Court finds and concludes that the submission of these proposed leases in 1972 and 1973 was an attempt by Henson to monopolize the furnishing of fbo services on the airport, in violation of 15 U.S.C. 2.

### Injunction Against Henson and HInc.

■ Conclusion 6. Alphin and others who wish to render some fbo services on the airport have the legal right to try to persuade the City officials: (a) that it would be in the public interest to have more than one fixed base operator on the airport; or (b) if the City decides that it is in the public interest to have only one fixed base operator, that the applicant should be the one rather than HInc.[23] Eastern Railroad Conference v. Noerr Motor Freight, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); Whitten v. Paddock Pool Builders, Inc., 424 F.2d 25 (1 Cir. 1970).

■ Conclusion 7. Alphin is entitled to an injunction restraining Henson and HInc. from attempting to monopolize any part of the business they now conduct on the airport under their existing lease, by negotiating on behalf of the City, as airport manager or otherwise, or using the position of airport manager in an effort to prevent others from establishing competitive operations, or in any

other way that would violate § 2 of the Sherman Act.

### Injunction Against the City

■ It is at best very doubtful whether an injunction may be issued against a City under 15 U.S.C. 26. Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), and other cases cited above. However, it is not necessary to decide that question in this case, because this Court has concluded that an injunction can be and should be issued against the City (a) under the general equitable jurisdiction of this Court, and (b) under its pendent jurisdiction, invoked in Count II of the amended complaint.

#### (a)

The "non-exclusivity" provisions of 49 U.S.C. 1349(a) and of the applicable FAA Advisory Circular, dated 4 April 72, are set out in Exhibit B. This Court has found (Finding 14) that FAA was familiar with the arrangements between Henson and the City, has dealt with Henson as the representative of the City on the airport over the years, and has not found that the relationship of Henson with the City, nor the operations which Henson and HInc. conducted on the airport, violated the "non-exclusivity" provisions of any applicable law or policy. It is not clear, however, that FAA approved the action of the former Mayor in authorizing Henson in late 1972 to negotiate on behalf of the City with Alphin and other persons who wanted to conduct operations on the airport which would compete with those being conducted by HInc. Although it does not appear from the evidence that the present City administration has permitted such negotiations, the position of Henson, as president of HInc., the airport manager, and the need of the City to consult Henson individually and as the president of the Airport Manager,

---

23. Despite Findings 39 and 40, Alphin should be given a fair opportunity to demonstrate to the City officials his claimed ability to finance his most recent or any future proposal.

requires the City to draw a line between what is permissible and what is not permissible under 49 U.S.C. 1349.

Conclusion 8. This Court has concluded that no broad injunction restraining the City in its operation of the airport should be granted, but that the history of the relationship of Henson with the City justifies and requires the issuance of a narrow injunction, restraining the City and its officials from permitting Henson to negotiate on behalf of the City with persons seeking leases or contracts permitting them to engage in activities on the airport which would compete with those engaged in by Henson, HInc., or any other corporation in which Henson is an officer or a stockholder.[24]

### (b)

The facts also justify such an injunction under Maryland law, particularly Article 41 of the Declaration of Rights, a part of the Maryland Constitution, as expounded in an elaborate opinion by the late Judge Offutt of the Court of Appeals of Maryland in Raney v. County Commissioners of Montgomery County, 170 Md. 183, 183 A. 548 (1936), which resulted in an injunction against the County based on Article 41. In the course of his opinion Judge Offutt said:

"Article 41 of the Maryland Declaration of Rights declares that 'monopolies are odius, contrary to the spirit of a free government and the principles of commerce, and ought not to be suffered.' Apart from that declaration, the instrument contains no denunciation of special privileges, except such as may be implied from the form of government which it erects. But when the democratic nature of that government, and the care and foresight exercised, in the formulation of that instrument, to safeguard the citizen in the enjoyment of privileges and immunities which were regarded as of common right, are considered, it is manifest that its people never intended that so highly important a right as that of equality before the law should be without protection. So that when the meaning to be given the word 'monopoly,' as used in article 41, is considered, great weight is to be given to the fact that but for that article the Constitution affords to the citizen no express protection against special and oppressive privileges.

"The word itself ordinarily connotes a privilege connected with commerce in commodities because, historically, it was more often used to describe a condition which resulted from an exclusive privilege to engage in such commerce, but it has long had a broader meaning, more in harmony with the spirit of the Constitution, and, in determining the sense in which it is used in that instrument, it should be given that meaning, that its general intent may be served, rather than thwarted or confined by any narrow or overnice construction." 170 Md. at 190, 183 A. at 551.

### The Issue of Damages

Conclusion 9. It is clear that Alphin is not entitled to recover any damages against the City.[25]

However, if Alphin had proved that he suffered any damage as a result of any

---

24. "In exercising its equitable jurisdiction, '[a] federal court has broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future unless enjoined, may fairly be anticipated from the defendant's conduct in the past.' NLRB v. Express Publishing Co., 312 U.S. 426, 435, 61 S.Ct. 693, 699, 85 L.Ed. 930 (1941). See also United States v. National Lead Co., 332 U.S. 319, 328–335, and n. 4, 67 S.Ct. 1634, 1638–1641, 91 L.Ed. 2077 (1947)." Zenith Corp. v. Hazeltine, 395 U.S 100, 132, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).

25. The amended complaint does not ask for damages against the City. A state, city or governmental agency may not be held liable for damages under the antitrust laws. Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943).

attempt to monopolize by Henson during the period of three years before May 4, 1973, he would be entitled to recover damages against Henson and HInc.

Conclusion 10. The Court finds and concludes, however, that Alphin has failed to prove that he has suffered any pecuniary loss as a result of any such attempt to monopolize, either during the three year period before May 4, 1973, or since that time. The facts which form the basis for this conclusion are set out in Findings Nos. 25 to 58. In summary, the Court has found that the City was and is justified in not entering into any long term leases or other agreement for a second fixed base operation on the airport until the final layout plan has been approved. Meanwhile, Alphin has been doing exactly what he asked to be allowed to do in May 1972 (see Findings 33 and 34).

Conclusion 11. The Court finds and concludes that even if Henson had not attempted to impede Alphin's efforts to obtain the type of lease Alphin wanted, the City would not, up to the present time, have entered into a lease or other agreement with Alphin permitting him to conduct the type of operation outlined in Beckman's letter of December 26, 1972 (see Finding 36) and/or in Alphin's proposal of May 1974 (see Finding 56).

The Court finds and concludes that Alphin has not proved that any false statements were made to or material facts withheld from any public officials by Henson. Such cases as Woods Exploration & Pro. Co. v. Aluminum Co. of America, 438 F.2d 1286 (5 Cir. 1971), and Walker, Inc. v. Food Machinery, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965), are no authority for relief in this case.

Moreover, Alphin has not proved that he has suffered any damage as a result of Henson's attempt to monopolize. The Court has considered such cases as Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652

(1946), which hold that juries are allowed to act upon probable and inferential, as well as direct and positive proof of damages. However, applying the liberal standard of such cases, this Court finds and concludes that Alphin has not shown that he could have financed and operated profitably a full fbo on the airport, if he had been given such a lease or contract by the City.

### Attorney's Fee

■ Although there is no Supreme Court case directly in point, the opinions of the lower federal courts are apparently unanimous in concluding that no attorney's fee may be allowed a plaintiff who obtains an injunction but no damages in a case brought under the antitrust laws. Byram Concretetanks, Inc. v. Warren Concrete Products Co., 374 F.2d 649 (3 Cir. 1967), and cases cited therein.

Conclusion 12. In this case, not only the denial of the claim for damages, but also the narrowness of the injunction which will be issued and the findings with respect to the negotiations and correspondence before the filing of the action (see particularly Findings 33–37, inclusive) justify, if they do not require, the denial of an attorney's fee to Alphin as part of his costs.

### Counterclaim

Conclusion 13. Judgment will be entered in favor of Alphin, the counterclaim defendant, on the counterclaim filed by Henson and HInc. against him for malicious abuse of process.

### Cross Claim

Henson and HInc. dismissed their cross claim against the City after the Court stated it would deny plaintiffs' claims for damages.

### Costs

Conclusion 14. Alphin should recover his taxable costs [26] against Henson and HInc. Henson, HInc. and the City should each bear his or its own costs.

---

26. See Advance Business Systems & Supply Co. v. SCM Corporation, 287 F.Supp. 143, at 161 et seq. (D.Md.1968), aff'd, 415 F.2d 55 (4 Cir. 1969).

831

EXHIBIT A

*Exhibit B*

Title 49 U.S.C. 1349(a) provides in pertinent part: "There shall be no exclusive right for the use of any landing area or air navigation facility upon which Federal funds have been expended."

FAA has issued policy statements and advisory circulars from time to time. The seven page Advisory Circular dated 4 April 72 contained the following statements, inter alia:

"6.a. *Exclusive Right.* A power, privilege, or other right excluding or debarring another from enjoying or exercising a like power, privilege, or right. An exclusive right may be conferred either by express agreement, by imposition of unreasonable standards or requirements, or by any other means. Such a right conferred on one or more parties but excluding others from enjoying or exercising a similar right or rights would be an exclusive right.

"7. POLICY. The grant of an exclusive right for the conduct of any aeronautical activity, on an airport on which Federal funds, administered by the FAA, have been expended, is regarded as contrary to the requirements of applicable laws, whether such exclusive right results from an express agreement, from the imposition of unreasonable standards or requirements, or by any other means. * * *

"a. *Agency Position.* The agency considers that the existence of an exclusive right to conduct any aeronautical activity limits the usefulness of an airport and deprives the using public of the benefits of competitive enterprise. Apart from legal considerations, the agency believes it clearly inappropriate to apply Federal funds to improvement of an airport where full realization of the benefits would be restricted by the exercise of an exclusive right to engage in aeronautical activities.

"b. *Application of Law.* The exemption contained in a surplus property deed permitting the grant of an exclusive right for the sale of gas and oil does not operate to confer a positive privilege. If the airport was already obligated by a prior agreement prohibiting an exclusive right, the deed does not relieve the owner from such obligation. Conversely, where such an exemption for gas and oil is in effect, any subsequent grant of Federal funds, administered by the agency, requires the airport owner to agree not to permit the establishment of an exclusive right to engage in aeronautical activities, including the sale of gas and oil, in the future and to terminate any existing agreement which permits such an exclusive right as soon as possible.

"8. INTERPRETATION OF POLICY. The circumstances involved in arranging for the availability of adequate aeronautical services vary widely from airport to airport. The following material has been prepared in an effort to furnish general guidance based on experience with exclusive rights problems.

"a. *Single Activity.* The presence on an airport of only one enterprise conducting aeronautical activities does not necessarily mean that an exclusive right has been granted. If there is no intent by express agreement, by the imposition of unreasonable standards, or by other means to exclude others, the absence of a competing activity is not a violation of this policy. This sort of situation frequently arises where the market potential is insufficient to attract additional aeronautical activities. So long as the opportunity to engage in an aeronautical activity is available to those who meet reasonable and relevant standards, the fact that only one enterprise takes advantage of the opportunity does not constitute a grant of an exclusive right.

"b. *Space Limitations.* The leasing of all available airport land or facilities suitable for aeronautical activities to a single enterprise will be construed as evidence of an intent to exclude others. This presumption will not apply if it can be reasonably demonstrated that the total space leased is presently required and will be immediately used to conduct the planned activity. The amount of space leased to a single enterprise should be limited to that for which it can clearly demonstrate an actual, existing need. If additional space becomes necessary at a later date, it must be made available, not only to an incumbent enterprise, but at the same time to all qualified proponents or bidders. The advance grant of options or preferences on future sites to a single incumbent is evidence of an intent to grant an exclusive right. On the other hand, nothing in this policy should be construed as limiting the expansion of a single enterprise when it needs additional space, even though it may ultimately reach complete occupancy of all space available.

" * * *

"9. ENFORCEMENT.

" * * *

"c. *Application to Preexisting Agreements.* On 17 July 1962, the agency defined the aeronautical activities by section 308(a) of the Federal Aviation Act. Prior to the publication of this definition, exclusive rights to conduct certain activities not involving the actual use of public landing areas were considered not to be in violation of the statute. * * * The termination date will in no event

be later than the earliest renewal or cancellation date specified in the lease or agreement covering such an exclusive right agreement. However, in no case will ADAP participation in airport improvement be authorized where there exists an exclusive right which was prohibited under the interpretation prior to 17 July 1962."

Paragraph 11a (1) requires all applicants for assistance to certify that there is no grant of an exclusive right which would preclude expenditure of funds by the agency under applicable law and agency policy at any public airport owned or controlled by the applicant, and 11a (2) requires that none will be granted on any airport owned or controlled by the applicant. Para. 11b states:

"It is the intent of this policy to promote fair competition at public airports and not to expose those who have undertaken to provide commodities and services to irresponsible competition. Prudent airport owners will adopt and enforce minimum standards to be met by those who propose to conduct a commercial aeronautical activity. Such standards, by expressing minimum levels of service that must be offered, relate primarily to the public interest, but appropriate requirements uniformly applied discourage substandard enterprises, thereby protecting both the established aeronautical activity and the airport patrons. The application of any unreasonable requirement, or standard not relevant to the proposed activity, or any requirement that is applied in a discriminatory manner shall be considered a constructive grant of an exclusive right contrary to applicable law and provisions of agency policy."